ACCEPTED
01-15-00253-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
7/10/2015 5:08:19 PM
CHRISTOPHER PRINE
CLERK

## No. 01-15-00253-CV

_____

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
7/10/2015 5:08:19 PM
CHRISTOPHER A. PRINE
Clerk

### IN THE COURT OF APPEALS FOR THE FIRST JUDICIAL DISTRICT OF TEXAS AT HOUSTON

_____

In the Interest of K.M-J aka K.M.J. and D.A.R.

_____

H.J. [mother], Appellants

v.

Department of Family & Protective Services, Appellee

_____

On appeal from the 314th Judicial District
of Harris County, Texas; No. 2012-06289J

_____

### APPELLEE'S BRIEF

_____


VINCE RYAN
COUNTY ATTORNEY
State Bar #99999939
Sandra D. Hachem (SBN 08667060)
Sr. Assistant County Attorney
1019 Congress, 17th Floor
Houston, Texas 77002
Telephone:  (713) 274-5293
Facsimile:  (713) 437-4700

ATTORNEY FOR APPELLEE,
DEPARTMENT OF FAMILY &
PROTECTIVE SERVICES


**ORAL ARGUMENT REQUESTED**
**[If deemed necessary]**

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................... ii

INDEX OF AUTHORITIES ................................................................................ iii

STATEMENT OF THE CASE ................................................................................v

REPLY POINTS .....................................................................................................v

STATEMENT OF FACTS .......................................................................................1

SUMMARY OF ARGUMENT ..............................................................................16

ARGUMENT AND AUTHORITIES .....................................................................18

Reply Point One:  HJ's challenge to the admissibility of Exhibit 17 should be overruled, because it was waived and the record fails to establish exclusion was warranted for untimely disclosure responses. .................................18

Reply Point Two: There was sufficient evidence to support the findings for termination of HJ's parental rights. ........................................................................25

    1.  Applicable Law and Standard of Review ...............................................25
    2.  The evidence sufficiently supported the finding that HJ engaged in conduct endangering to a child for a finding under E, because her children all suffered substantial physical injuries or untreated medical conditions under her care which she either caused or allowed. ....................27
    3.  The evidence sufficiently supported the finding that termination was in the children's best interest considering the evidence in support of Subsection E, as well as the mother's failure to honestly address her inappropriate behaviors by the time of trial. .........................................31

PRAYER FOR RELIEF ........................................................................................36

CERTIFICATE OF SERVICE ..............................................................................36

CERTIFICATE OF WORD COUNT COMPLIANCE...........................................36

# INDEX OF AUTHORITIES

**<u>CASES</u>**                                                                 **<u>PAGE</u>**

*In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002) ...............................................................25

*Chrysler Corp. v. Blackmon*, 841 S.W.2d 844 (Tex. 1992) ....................................24

*Dupree v. Texas Dep't of Protective & Regulatory Servs.,*
  907 S.W.2d 81 (Tex. App.-Dallas 1995, no writ)..................................................35

*Holley v. Adams,* 544 S.W.2d 367 (Tex. 1976) ...........................................31, 32, 34

*In re J.D.*, 436 S.W.3d 105 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ...... 32

*In re J.F.C.,* 96 S.W.3d 256 (Tex. 2002) ...................................................................26

*Jordan v. Dossey,* 325 S.W.3d 700
  (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ..............................................30

*In re J.P.B.*, 180 S.W.3d 570 (Tex. 2005) ................................................................30

*In re L.D.A.,* No. 01-14-00782-CV, 2015 WL 293118
  (Tex. App.—Houston [1st Dist.] 2015, no pet.)....................................................34

*L. M. v. Dept of Fam. & Prot. Servs.*, 2012 WL 2923132
  (Tex. App.—Houston [1st Dist.] 2012, no pet.)....................................................23

*Langley v. Comm'n for Lawyer Discipline*, 191 S.W. 3d 913
  (Tex. App.—Dallas 2006, no pet)........................................................................21

*PR Investment and Specialty Retailers, Inc. v. State*, 251 S.W.3d 472,
  480 (Tex. 2008).....................................................................................................24

*In re R.N.W.,* 01-13-00036-CV, 2013 WL 3467206
  (Tex. App.—Houston [1st Dist.] 2013, no pet.)....................................................33

*Richard v. Towery,* No 01-11-00132-CV, 2013 WL 1694861
  (Tex. App.—Houston [1st Dist.] 2013, no pet.)....................................................21

*In re T.L.R.*, No. 14-14-00812-CV, 2015 WL 1544796
(Tex. App.—Houston [14th Dist.] 2015, no pet.)....................................34

*Texas Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531 (Tex.1987).......................27

*Wigfall v. Texas Dept of Criminal Justice*, 137 S.W.3d 268
(Tex. App.—Houston [1st Dist.] 2004, no pet.) ....................................24

## **STATUTES**

Tex. Fam. Code Ann. §161.001 (West 2008)................................. iv, 25, 27, 31, 33

Tex. Fam. Code Ann. §263.307 (West 2008)...............................................32, 34, 35

## **RULES**

Tex. R. App. P. 33.1.........................................................................................20

Tex. R. Civ. P. 306...........................................................................................25

Tex. R. Evid. 103 .............................................................................................20

## STATEMENT OF THE CASE

On November 7, 2012, the Department filed a suit for protection of two children under the age of 3 and the trial court granted the Department temporary managing conservatorship. CR[1] 3 and 32. Trial commenced before the bench on January 30, 2014 but resumed on a much later date on October 7, 2014. CR 81. A judgment was signed on February 26, 2015. CR 89.

The written judgment established the paternity of Jorge as the father of DJ, and ordered termination of his parent-child relationship. CR 83-85. The parental rights of the mother (HJ) were terminated on findings that it was in the children's best interest and that she committed the predicate act of Subsection E of Section 161.001(1) of the Family Code. CR 83. The judgment also terminated the parental rights of KJ's alleged and unknown father. CR 85-86. The Department was named the children's sole managing conservator. CR 86. No motion for new trial was filed. HJ filed a timely notice of appeal on March 13, 2015. CR 107.

## REPLY POINTS

**Reply Point One: HJ's challenge to the admissibility of Exhibit 17 should be overruled, because it was waived and the record fails to establish exclusion was warranted for untimely disclosure responses.**

**Reply Point Two: There was sufficient evidence to support the findings for termination of HJ's parental rights.**

---

[1] In this brief "CR" refers to the Clerk's record filed in this appeal on October 17, 2014 from cause no. 2013-03157J.

No. 01-15-00253-CV

_____

IN THE COURT OF APPEALS FOR THE
FIRST JUDICIAL DISTRICT OF TEXAS AT HOUSTON
_____

In the Interest of K.M-J aka K.M.J. and D.A.R.
_____

H.J. [mother], Appellants
v.
Department of Family & Protective Services, Appellee
_____

**APPELLEE'S BRIEF**
_____

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

Department of Family & Protective Services, Appellee, [hereinafter "Department"] submits this brief in response to the brief of TM

**STATEMENT OF FACTS**

HJ was born on December 15, 1991. RR-4[2] p. 13. In 2009, when she was about 17 years of age, she had a son named Jonathan. RR-4 p. 90.[3] Her daughter, KJ, was born the next year in 2010. RR-4 p. 13. The year after that, in 2011, her son, DJ, was born. RR-4 p. 14. No one was listed as DJ's father on his birth

_____

[2] In this brief "RR-4" refers to the fourth volume of the reporter's record which contains the exhibits from the trial held in this case.

[3] Officer determined the date of birth of the victim/complainant Jonathan was 5/6/2009. RR-4 p.90.

certificate but KJ's birth certificate named Jose Martinez-Morales as her father. RR-4 p. 13-14.

On November 4, 2012, the Department received a referral concerning HJ's family after her son Jonathan, then three years of age, was pronounced dead upon arrival at Texas Children's Hospital. RR-4 p. 23 and 90. The hospital's medical staff observed Jonathan had signs of external trauma with bruises on his face and neck area. RR-4 p. 23. It was also observed that he had abrasions on the bridge of his nose and right frontal area of his forehead. RR-4 p. 23. When HJ was asked about the injuries, she stated he fell at the park the previous day. RR-4 p. 23.

On the date of the referral, the Department's worker Shannon spoke with a forensic nurse at Texas Children's Hospital by telephone. RR-4 p. 24. The nurse commented while the bruising on Jonathan's face could be consistent with the mother's explanation of a fall, the child also had bruises behind his ears, looped bruises on his legs and non-specific bruises on his back. RR-4 p. 24.

Shannon went to visit the family and observed the two younger children. RR-4 p. 26. She did not see any observable injuries, but at some point she learned KJ had a broken ankle because she advised Detective Lujan of the Houston Police Department of that fact in preparation of the parent interview. RR-4 p. 26. Shannon also learned from Lisa Kremer, a social worker at Texas Children's

Hospital, that the youngest child, DJ, was developmentally delayed and a CT scan revealed some abnormalities that could indicate previous abuse. RR-4 p. 26.

Officers from the Houston Police were assigned to investigate Jonathan's death. RR-4 p. 90. HJ advised one of the officers that Jonathan's father was in Mexico and Jorge was the child's stepfather. RR-4 p. 90. She stated she did not assault the child, but claimed the child fell in the playground days before. RR-4 p. 90. The next day an autopsy was performed and the assistant medical examiner, Dr. Phatak, ruled the death a homicide by blunt force trauma to the abdomen. RR-4 p. 90. He told one of the officers that he believed the cause of death was a perforated intestine which leaked bile into the child's body. RR-4 p. 90. He commented that injuries of that type typically take 48-72 hours before death results. RR-4 p. 90.

In speaking with medical personnel, Jorge denied causing any harm to the child, but when Investigator Chavez spoke with him, he eventually admitted to "play boxing" with his 3 year old step son on November 2, 2012. RR-4 p. 90. HJ claimed she was in another room at the time but heard Jonathan crying and Jorge told her he was "play boxing" with him. RR-4 p. 90. Nonetheless, Dr. Phatak explained to perforate the child's intestines, "it would have been a 'substantial' strike in the torso" and not merely "play boxing." RR-4 p. 90.

On November 7, 2012, a physician at Texas Children's Hospital prepared a statement regarding his conclusion that KJ had injury consistent with abuse or neglect. RR-4 p. 153. The doctor's statement documented that the child was brought to him accompanied by her great aunt. RR-4 p. 153. The aunt told the doctor that KJ's injury occurred a month earlier and KJ's mother told her that the injury resulted from an incident when KJ lost balance on a toilet seat. RR-4 p. 153. It was noted that KJ evidently reinjured herself recently but the aunt did not know any details about that. RR-4 p. 153.

The statement detailed what the x-ray revealed. It showed fracture of the distal right tibia and extensive callus formation indicating "repeated trauma" as well as an unexplained healing abrasion of the nose. RR-4 p. 153. The doctor also noted the child had unexplained injuries of different ages and swelling and symptoms of injury that apparently were not taken for medical attention. RR-4 p. 153. The doctor's statement indicated the lack of immediate medical treatment for this child was the type neglect that could result in permanent physical damage that could affect growth and cause permanent deformity to the child. RR-4 p. 153.

The same date the physician prepared this statement, a complaint was prepared against Jorge for felony murder in connection with Jonathan's death and an indictment was thereafter issued. RR-4 p. 90-93. Detective Lujan of the Houston Police told the Department's caseworker Shannon that Jorge admitted to

4

"playfully hitting Jonathan in the stomach." RR-4 p. 26. Shannon asked Jorge about that, and he admitted to "playfully hitting" Jonathan but claimed it was not hard enough to hurt him. RR-4 p. 26. When Shannon asked HJ about this, HJ admitted "to seeing" Jorge hit Jonathan in the stomach but also described it as in a "playful" manner. RR-4 p. 26. When asked about KJ's broken ankle, HJ claimed this happened when KJ stepped out of the tub and landed on her foot in a way that caused her to hurt her ankle. RR-4 p. 26. HJ claimed she did not talk about that at her first interview with Shannon because "she was nervous and forgot." RR-4 p. 26. When asked about the possible head injuries seen on her youngest child's CT scan, she responded that neither she nor Jorge hit the child. RR-4 p. 26. She added, however, that possibly her babysitter or one of the other children did it. RR-4 p. 26. However, when Shannon asked HJ for the babysitter's contact information, HJ claimed she did not have it. RR-4 p. 26.

Because the parents provided no or conflicting explanations regarding the injuries and possible previous injuries to the children, the Department prepared paperwork to seek temporary managing conservatorship of the children. RR-4 p. 27. After the suit was filed, HJ appeared at the adversary hearing and at the conclusion the court signed a written order granting the Department's request for temporary managing conservatorship. RR-4 p. 29-37.

The court's written order provided some tasks the parents were required to complete. RR-4 p. 36-37. The parents were advised in the written order that failure to complete those tasks could result in restriction or termination of parental rights. RR-4 p. 35. Among the tasks listed which the parents were required to perform "no later than thirty days from the date of this hearing" included providing: (1) full name and whereabouts of absent parents; (2) submit the Child Placement Resources Form and "provide to the Department and the Court the full name and current address or whereabouts and phone number of any relatives of the children … with whom the Department may place the children" (3) sufficient financial information to identify parent's net resources; (4) sufficient information to establish parentage and immigration status, (5) the children's medical history; and (6) provide a current residence address and telephone number for contact purposes and ensure the Department has any changes to contact information within five (5) days of a change. RR-4 pp. 35-37.

HJ appeared at the next hearing on December 18, 2012. RR-4 p. 41. The Court found that HJ reviewed the service plan and understood unless she was willing and able to provide the children with a safe environment, even with the assistance of that plan, her parental rights could be terminated. RR-4 p. 41. The court ordered HJ's family service plan filed with the court on or before that date and incorporated it as part of the court's order. RR-4 p. 42.

6

HJ's service plan noted the injuries to the children as part of the Department's concerns as of December 2012, but also added concern because HJ did not obtain treatment for both KJ and DJ when they were obviously delayed, did not protect her child Jonathan from Jorge, and did not seek medical treatment for KJ's ankle. RR-4 p. 47. The plan also added as concern the fact that HJ had a history of being a victim in relationships, admitted she was physically abused by one of the children's alleged fathers (Mr. Martinez Morales)[4] who was deported after he was arrested, and HJ did not appear capable of protecting her children from people she brought into their lives. RR-4 p. 47. Consequently, the plan listed as goals that HJ demonstrate willingness and ability to protect her children from harmful people, and demonstrate an ability to change her pattern of behavior that resulted in the abuse/neglect. RR-4 p. 47.

The service plan included some basic tasks HJ was required to perform including that she obtain stable housing and employment, participate in psychological and therapy services, attend court hearings and visits, complete parenting and domestic violence classes, and submit to drug screenings. RR-4 p. 48-49. However, the court also signed a separate order that same date that added several other tasks, including that the mother refrain from criminal activity and complete a substance abuse treatment program. RR-4 p. 63.

---

[4] Jose Martinez-Morales was named in KJ's birth certificate as her father and alleged to be her father. RR-4 p. 13 and 66.

7

A permanency report prepared by the Department the next year, in November 2013, noted that HJ has been compliant in performing the basic tasks listed in the plan. RR-4 p. 70. In particular, it noted HJ provided the agency with a copy of her apartment lease, provided proof of employment, completed her psychological, provided proof of completing parenting classes and attended visits. RR-4 p. 70 With respect to placement, the report noted HJ reported her mother was willing to care for the children and it had been explained to HJ that a home study would need to be completed on her mother's home. RR-4 p. 70. As for other relatives, the caseworker advised HJ that the caseworker could not get a hold of them with the information she provided. RR-4 p. 70. The reported noted HJ told the worker she would have the relatives contact the worker. RR-4 p. 70.

On January 30, 2014, the parties appeared before the court for trial. RR-2 p. 1. The Department's attorney stated some exhibits and a witness would be called, but was asking that the court start the trial and then recess because there was a problem with availability of the Department's doctor witness. RR-2 p. 6. HJ's attorney objected claiming the persons the Department intended to call were not identified in disclosures. RR-2 p. 7. The court overruled that objection. RR-2 p. 7.

The Department proceeded with examination of Jamal George, who identified himself as the custodian of records for Texas Children's Hospital. RR-2 p. 8. The medical records that Jamal brought to court were referred to as

8

Petitioner's Exhibit 17 and offered as business records. RR-2 p. 9. HJ's attorney objected as follows: "I object to Exhibit 17 on the basis that this document has just recently been provided to me and it contains opinions from doctors that were not identified in response to my disclosure request." RR-2 p. 9. That objection was overruled and the records were admitted. RR-2 p. 9.

HJ then proceeded to testify and identified herself as the mother of KJ and DJ. RR-2 p. 10. She stated that Jose Martinez was the father of KJ and Jorge was the father of DJ. RR-2 p. 30. HJ claimed she was married to KJ's father, but he was deported after she presented a claim of domestic violence against him. RR-2 p. 30. She stated she presented that in January 2010. RR-2 p. 30.

HJ stated that her children came in care after Jonathan died. RR-2 p. 10. HJ stated she loved her children very much and only skipped visits with them twice during this case when she did not have money to pay for a taxi. RR-2 p. 26-27.

When asked if Jonathan was fine prior to the day that he was taken to the hospital, she responded, "no" but added "I called the ambulance because my son was complaining that he hurt here (indicating)." RR-2 pp. 10-11. She said the worker told her that her son died as a result of an injury to his stomach but she claimed she never saw any injury or assault on her son. RR-2 p. 13.

HJ confirmed at the time of the injury, it was just her, her boyfriend and the three children in their single bedroom home. RR-2 p. 14. She stated that she took

care of the children, her boyfriend worked and they slept in the den on the floor while the children stayed in the bedroom. RR-2 p. 14-15.  She stated on "that day," she took the children to the park and Jonathan fell and scratched his eye, but after she took care of his eye, they continued to play. RR-2 p. 15.

She stated when she put the children to bed, Jonathan was fine. RR-2 p. 18. She stated her boyfriend came home that evening around 9 or 10. RR-2 p. 15-16. She stated he did not play with Jonathan because the children had already gone to bed. RR-2 p. 16. When asked if she heard her child moaning about 4 am, she responded: "He was going to the bathroom and he saw that the child was cold. And so, I called the ambulance." RR-2 p. 18. When asked to clarify why she called the ambulance, she responded he said he hurt. RR-2 p. 18.  She indicated she told them: "hurry up because my child is dying and the guys from the ambulance said that there was not an ambulance available for the area where I lived." RR-2 p. 19.

In her initial testimony, she claimed she never told the detective she saw Jorge play boxing with Jonathan, but when asked again she admitted she did. RR-2 p. 16-17. She also confirmed she told the investigator for CPS the same thing. RR-2 p. 17.  Nevertheless, when asked why her story now, a year later, is that she did not see her boyfriend play boxing, HJ claimed she felt pressured. RR-2 p. 17.

HJ acknowledged she was told her three year old boy died because his intestines exploded in his body. RR-2 p. 19.  However, she claimed he looked fine

10

when she put him to bed and she never left him and was always with him either at the park or in their one-bedroom apartment. RR-2 p. 20.

HJ also stated she never saw the father being violent with the children and claimed she never physically disciplined the children. RR-2 p. 21. She stated before her child died, everything was going okay with that child. RR-2 p. 23. He ate normally and when the children finished eating she gave all three of the children a bath. RR-2 p. 23. She stated Jonathan did not manifest discomfort during the bath. RR-2 p. 23. She also claimed he had no discomfort and looked normal when she put him to bed. RR-2 p. 23. She said the father came home when they were already asleep and they went to bed around 11 pm. RR-2 p. 24. She heard her child in pain around 3 or 4. RR-2 p. 24. When he indicated he was hurting, she then woke the father and they called 911. RR-2 p. 24-25. She indicated she initially had difficulty because they could not speak in Spanish but they eventually came in 15 or 16 minutes. RR-2 p. 25.

HJ acknowledged to the court that she told two people that she saw her boyfriend play boxing with her son. RR-2 p. 26-27. However, she was now saying the father never was play boxing with the child. RR-2 p. 26. She claimed she made this inconsistent statement because on that day when she saw her child dead she did not know what to say. RR-2 p. 26. Also, because the man was saying: "If you don't help me, you can go to jail ... And I don't want to go to jail because I

11

did nothing." RR-2 p. 26. She stated she had no idea what happened to the child to cause him to die. RR-2 p. 27. She stated if she was aware the father was physically violent, she "would make him pay." RR-2 p. 27.

The court then asked HJ about her statement in court the last year that her boyfriend play boxed with her child. RR-2 p. 28. The court asked HJ if she felt pressured on that day in court when she said that. RR-2 p. 28. HJ responded, "Yes, because I was afraid." RR-2 p. 28. She added she was afraid to go to jail for something she did not do so she made up the story about the play boxing by her boyfriend. RR-2 p. 28-29. When asked why she came up with a story involving her boyfriend, she stated it was the only thing that came to her mind. RR-2 p. 29.

Upon further examination, HJ was asked about the older bruises on Jonathan that were not brand new. RR-2 p. 31. She stated: "That's because when he was born, he was born with purple marks back there." RR-2 p. 31-32. When asked again how the bruises got on her dead baby's legs and who did that, she responded: "I didn't do it. I went to see a friend of mine the day before and the children – my children played with her children who are older than mine. " RR-2 p. 32. She claimed when they played she asked: "Why were they doing that to the child?" RR-2 p. 32.

12

At the conclusion of HJ's testimony, the court stated that it would be a good time to continue the case. RR-2 p. 34. However, before being dismissed, HJ's attorney stated:

I am going to offer the responses to disclosures as Respondent's No. 1.

RR-2 p. 34. The court then asked who they were from and HJ's attorney responded:

From the county attorney to me.

RR-2 p. 34. After that statement the court stated the document was admitted. RR-2 p. 34.

Strangely, this document admitted as "the responses to disclosures" "from the county attorney" indicated it did not come from this case. RR-4 p. 171. Namely, the second page of the document provided a different court number (2010-01939J), involving a different child (Darwin Wilfredo Vargos) and a different court (the 315th). RR-4 p. 171. Also the Assistant County Attorney identified in the document as the county attorney who filed the document was Gene Gundersen, and not the Assistant County Attorney involved in this case. *Id.*

Several months passed before the court resumed trial on October 7, 2014. RR-3 p. 1. Prior to that time, another permanency report was filed on September 18, 2014 that advised the court that both children were doing well in their foster care placements, but concern was reported about KJ who was saying she was

hearing voices and a baby crying. RR-4 p. 156 and p. 159. The foster mother was seeking a psychological evaluation for her. RR-4 p. 159. With respect to parental progress, the status about HJ's compliance in performing basic tasks in the service plan appeared the same as in the prior report. RR-4 p. 26.

The first witness examined when trial resumed was Jorge. RR-3 p. 9. He stated he was the father of DJ. RR-3 p. 9. He suggested he was also the father of KJ. RR-3 p. 9. He acknowledged a child died in his home. RR-3 p. 9. However, when questions were attempted regarding the situation when that child died, his attorney instructed him not to answer and no further questions were attempted in that regard. RR-3 p. 9-10. He did acknowledge, however, that he was asking the court to return DJ to him and stated he was capable of caring for him and had family support. RR-3 p. 11.

The next witness was the Department caseworker assigned for the children: Casey Arshield. RR-3 p. 13. She confirmed that the children were at that time ages 4 and 2. RR-3 p. 13. She stated that all their physical and emotional needs were being met in their placement in foster care. RR-3 p. 13. She stated that the children had been in foster care since 2012, and the foster home where they had been placed for a long time was willing to adopt. RR-3 p. 14-15 and p. 23. She acknowledged they tried for a long time to place with family members, including a

grandmother in California, but no family members worked out for placement and it was time for the children to have permanency.  RR-3 p. 15.

She stated the children did not have special needs, but KJ had been hearing a baby crying continuously in her head and at the end of August, her foster parent took her for a psychological.  RR-3 p. 14.  They did not have the results yet. RR-3 p. 14-15.

Casey stated that they were asking that Jorge's parental rights be terminated because he stated he caused the injuries to the child that died and was in jail for injuries of that child. RR-3 p. 19-20.  As for the alleged father, Jose, Casey stated he was believed to be in Mexico based on information from the mother.  RR-3 p. 20.  As for HJ, Casey confirmed she just got placed on the case a month prior and could not personally give an opinion on HJ because she had not been on the case long enough.  RR-3 p. 15-16 and 22.

Casey acknowledged she told HJ's attorney that HJ completed the family service plan. RR-3 p. 21.  In particular, she acknowledged that HJ had a home and was employed.  RR-3 p. 24.  She also acknowledged that the purpose of a service plan is to try and cure the risks that brought the child in care and eliminate future risks. RR-3 p. 22.   She acknowledged the mom interacted well with her children and they loved each other. RR-3 p. 23.  When asked if she spoke with the children

regarding their desires, she noted that DJ was only two and KJ had not really responded about that. RR-3 p. 25-26.

During closing argument, the Department's attorney specifically referred to P17 and the document's statement that indicated KJ's injury had been in existence for more than a month. RR-3 p. 31-33. When HJ's attorney responded to the Department's closing argument, no claim was made regarding the admissibility of P17 or any clarification on the disclosure claim previously suggested at trial and instead the attorney focused solely on the evidence regarding Jonathan's death. RR-3 pp. 36-37. At conclusion of the case, the court orally announced that he was terminating the mother's parental rights under both Subsections D and E. RR-3 p. 42. Nevertheless, the written decree only had the court's finding under E. CR 83.

## SUMMARY OF ARGUMENT

Appellant's Brief essentially raises two challenges. The first challenge is to the admission of Department's Exhibit 17 and the second challenge claims insufficient evidence in support of the findings that supported the court's decision to terminate HJ's parental rights. Both challenges should be overruled.

First, with respect to the admissibility of Exhibit 17, this claim should be overruled because the objection to that exhibit was waived and the basis for exclusion was not established. HJ's objection was waived because it was not specific enough to preserve error for review. Namely, neither the particular

16

disclosure request or doctor opinion in P17 were identified for the court to consider a specific claim about a discovery violation. In addition, the challenge should be overruled because the record does not establish a discovery violation occurred as claimed in the objection. The objection claimed something in Exhibit 17 contained "opinions from doctors that were not identified in response to [HJ's] disclosure request." Nevertheless, HJ's attorney provided no proof of the alleged disclosure request that would have related to those unidentified documents. Notably, at the end of the hearing on the first day of trial HJ offered, and the court admitted, a document that HJ's attorney described as the response to disclosures. However, that document was not admitted until long after the objection was lodged and did not appear to even involve this case. Consequently, HJ's claim of exclusion based on an alleged discovery violation by the Department was not established to support the objection raised.

With respect to the court's findings in support of parental termination, the evidence was more than sufficient. The evidence was undisputed that all three of HJ's children had suspicious injuries that led to the referral of this case to the Department, the medical examiner concluded the oldest child's death resulted from homicide, and a doctor who examined KJ concluded the child had a broken ankle, untreated for a month, for which no medical care was provided and there were signs of repeated trauma. Also, the mother acknowledged she had been in a

situation of domestic violence with the father of her oldest child and the father of her youngest child admitted he caused the injury to the oldest child before the child's death – though he described it as playful hitting.

HJ was given ample opportunity to either acknowledge and address the abusive circumstances in her home or provide a feasible explanation for the injuries that occurred there. She did neither. The record confirms she typically gave inconsistent or unbelievable explanations or no explanation at all. Considering she claimed she was always with her children in a single bedroom home, the trier of fact had more than sufficient basis to disbelieve her claim that she played no part in the injuries that occurred to her children. The court had more than sufficient basis to conclude that the mother engaged in conduct that caused or allowed the injuries her children suffered for the court's finding under Subsection E. Moreover, considering the young age of the children, the inability to find a suitable relative and the willingness of the foster parents to adopt the children, the court had more than sufficient basis to conclude that termination was in the children's best interest. The court's judgment should be affirmed.

## <u>ARGUMENTS AND AUTHORITIES</u>

**<u>Reply Point One</u>:  HJ's challenge to the admissibility of Exhibit 17 should be overruled, because it was waived and the record fails to establish exclusion was warranted for untimely disclosure responses.**

HJ's first point of error claims the trial court erred in admitting Exhibit 17 over HJ's objection, because it contained doctor opinions that were required to be excluded under Tex. R. Civ. P. 193.6. This claim should be overruled because it was waived and unsupported.

First, this claim should be overruled because it was waived. The single objection made at trial when Exhibit 17 was offered for admission at trial was as follows:

> "I object to Exhibit 17 on the basis that this document has just recently been provided to me and it contains opinions from doctors that were not identified in response to my disclosure request."

RR-2 p. 9. As indicated, this objection claims Exhibit 17 is inadmissible, because the document contains "opinions from doctors" that were "not identified in response to my [HJ's] disclosure request." No further clarification was given identifying particular statements in Exhibit 17 that allegedly constituted "opinions from doctors." Moreover, while it appears to be a challenge for a discovery violation, the record does not contain a certificate of discovery establishing discovery was timely sent to the Department, the alleged discovery was not admitted for the court to consider the discovery claim when this objection was made, and no explanation was given regarding what the discovery request said, when it was sent, or who it was propounded upon. These inadequacies in the

objection meant the objection lacked the specificity and proof necessary to preserve error concerning a discovery violation.

Namely, as provided in Tex. R. App. P. 33.1, to preserve error in the trial court, there must be a timely and specific objection and it must be in conformity with any rule or statutory requirements. The specific rule concerning the admission of evidence provides: "Error may not be predicated upon a ruling which admits … evidence unless a **substantial right of the party is affected** and … a **timely objection or motion to strike appears of record, stating the specific ground of objection**, if the specific ground was not apparent from the context." Tex. R. Evid. 103 (emphasis added). As indicated, this specific rule has two parts. The first part requires the complaining party show a "substantial right" was affected by the court's ruling to admit the evidence. That means the record shows the complaining party established a right to exclusion of the challenged evidence, and the party's right was "substantial." The second part requires the record to show the objection to the admission of evidence was made "timely" and with clear enough explanation for the court to determine the "specific ground of objection" upon which the alleged substantial right is based. In this case, neither part was met to permit HJ to predicate error on the court's decision to admit Exhibit 17.

In particular, though HJ claims in this appeal that she had a right to exclusion of Exhibit 17 based on her objection about untimely responses to

20

requests for disclosures about doctor opinions, the record does establish she proved any right to exclusion on that basis. Namely, there is no proof the Department was timely served with certain discovery requests by HJ in this case, and no proof the Department actually received a specific disclosure request that would have required the Department to provide disclosure of doctor opinions contained within Exhibit 17. *See Richard v. Towery,* No 01-11-00132-CV, 2013 WL 1694861 *5 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (no error established because complaining party failed to identify the specific requests to which the complained documents applied); *Langley v. Comm'n for Lawyer Discipline*, 191 S.W. 3d 913, 915 (Tex. App. Dallas 2006, no pet) (an appellate court cannot say a court abused its discretion in admitting documents not produced in discovery when the record does not contain the relevant discovery requests). In this connection, it should be noted that no motion to compel was filed prior to this case concerning unanswered discovery, and no further discussion or hearing was held explaining or proving up alleged untimely responses to discovery concerning doctor opinions.

It is acknowledged that long after the court overruled HJ's objection to Exhibit 17 but before the conclusion of the first day of trial, HJ's attorney offered what was described as "the responses to disclosures as Respondent's No. 1." RR-2 p. 34. Though the court inquired for a little more description of that exhibit, HJ's attorney only added they are: "From the county attorney to me." RR-2 p. 34.

Consequently, HJ's attorney did not represent when these responses were received by HJ, or when the requests for the responses were sent out or to which party. *Id.* Though the court admitted this document, it did little to clarify or prove up HJ's previous objection, especially considering HJ did not re-urge her objection at the time this document was admitted.

Moreover, as discussed in the Statement of Facts above, the admitted document was confusing because parts did not even come from this case. RR-4 p. 171. Namely, the second page of the document provided a different court number (2010-01939J), involving a different child (Darwin Wilfredo Vargos) and a different court (the 315th). RR-4 p. 171. Also the Assistant County Attorney identified in the document as the county attorney who filed the document was Gene Gundersen. and not the Assistant County Attorney involved in this case. *Id.* The first page of HJ's exhibit did include reference to parties in this case and had a reference in one of the requests to the cause number in this case; however, other pages that might have indicated these were discovery in this case were mysteriously missing and this document was combined with discovery responses from another case. RR-4 pp. 170-81. In light of that fact, the trier of fact had more than sufficient basis to question the weight of this document as proof of anything for purposes of this case. Therefore, this record does not prove a discovery violation occurred to entitle HJ to any right of exclusion.

In addition, the second part of Rule of Evidence 103 was not established as a predicate to HJ's claim on appeal, because the specific ground of HJ's objection was not clear. HJ's objection referred to "doctor opinions" not produced in response to disclosure requests. However, HJ never clearly identified the particularly doctor opinions at issue or the particular disclosure requests these may have been responsive to.

In this connection it is important to note that Exhibit 17 was not just doctor opinions. It was the medical records from Texas Children's Hospital. RR-4 p. 102-154. HJ's objection did not challenge the medical records as a whole – only the doctor opinions. Exhibit 17 included an affidavit confirming it was the business records of the hospital kept in the regular course of its business to permit its admissibility as a business record. RR-4 p. 102; Tex. R. Evid. 803(6). Consequently, even if HJ preserved error regarding some unspecified doctor opinions contained within Exhibit 17, a general objection to evidence as a whole that does not point out the objectionable part is not reversible error. *See L.M. v. Dept of Fam. & Prot. Servs.*, 2012 WL 2923132 (Tex. App. – Houston [1st Dist.] 2012, no pet.) (citing *Speier v. Webster Coll.,* 616 S.W.2d 617, 619 (Tex. 1981)).

Lastly, the Supreme Court has clarified even when a discovery sanction is warranted for a discovery violation that does mean exclusion is the only action the court can take. A court is never to impose a sanction more severe than necessary to

23

satisfy the legitimate purposes underlying the discovery process, and courts have the right to consider less stringent remedies in response to a discovery violation. *PR Investment and Specialty Retailers, Inc. v. State*, 251 S.W.3d 472, 480 (Tex. 2008). Consequently, even when a party fails to establish "good cause" for failure to timely provide discovery responses, the Supreme Court has recognized a trial judge has the power to consider other options, including granting a continuance. *Id.*

In this connection, the court in this case essentially crafted a continuance remedy that addressed any alleged harm or prejudice based on late responses, because the court cut short the first day of trial and did not resume trial until several months later. *See* RR-2 p. 1 and RR-3 p. 1 (from January to October). With such a lengthy delay in the proceeding, HJ's attorney had more than enough time to investigate, prepare and respond to the evidence in Exhibit 17 that he suggested was not provided timely enough. As such, even if HJ had a right to exclusion of Exhibit 17 for untimely responses, the court's decision to delay continuation of the trial for several months provided an appropriate remedy to address the legitimate purposes underlying the discovery process at issue. *See Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 850 (Tex. 1992) (whether sanction to address a discovery violation is just considers whether party moving for sanctions is unable to prepare for trial without the requested discovery); *See also Wigfall v. Texas Dept of Criminal Justice*, 137 S.W.3d 268, 274 (Tex. App.—

Houston [1st Dist.] 2004, no pet.) (no error could be predicated on party's claim concerning failure to timely designate expert witness where complaining party did not request a continuance or contend he was unable to conduct his own discovery in preparation of trial).  Accordingly, this point should be overruled.

**Reply Point Two: There was sufficient evidence to support the findings for termination of HJ's parental rights.**

### 1.  Applicable Law and Standard of Review

Section 161.001 of the Family Code authorizes termination of parental rights on a finding by clear and convincing evidence that (1) the parent committed at least one of several predicate acts or omissions listed under section 161.001(1) of the Family Code and (2) that termination is in the child's best interest.  Tex. Fam. Code Ann. §161.001 (West 2008).  In this case, the court made these requisite findings in the court's written decree, as required by Tex. R. Civ. P. 306, and specifically concluded that HJ committed the predicate act provided at Subsection E and that termination was in the children's best interest.  CR 83.  Appellant's Brief challenges the legal and factual sufficiency of the evidence to support the predicate findings.

With respect to the applicable standard of review, this court's standard considers the clear and convincing burden of proof at trial. *See In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002) ("burden of proof at trial necessarily affects appellate review of the evidence."). In that connection, both legal and factual sufficiency

challenges consider the standard of proof for clear and convincing evidence by considering whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the State's allegations. *Id*. The Supreme Court explained, in light of the identical inquiries made to the clear and convincing standard, the distinction between legal and factual sufficiency when the burden of proof is clear and convincing evidence may be a fine one `in some cases, but clarified that there is a distinction in how the evidence is reviewed. *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002). In a legal sufficiency review, a court should look at all of the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true, giving appropriate deference to the trier of fact. *Id*. In a factual sufficiency review, a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing and with respect to disputed evidence, a court should consider whether the disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id*. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. 96 S.W.3d at pp. 266-67.

**2. The evidence sufficiently supported the finding that HJ engaged in conduct endangering to a child for a finding under E, because her children all suffered substantial physical injuries or untreated medical conditions under her care which she either caused or allowed.**

Subsection (E) of Section 161.001(1) of the Family Code involves proof that a parent engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the child's physical or emotional well-being. Tex. Fam. Code Ann. §161.001(1)(D)(E) (West 2008). The definition of endangerment includes its general meaning: that is, exposing a child to loss or injury or jeopardizing a child's emotional or physical health. *Texas Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987). As explained by the Supreme Court, the proof for endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone. *Boyd,* 727 S.W.2d at p. 533. Also, it is not necessary that the parental misconduct be directed at the child, occur in the child's presence or that the child actually suffer injury from it.

The primary evidence of endangering conduct by HJ in this case involves the many injuries and untreated medical conditions which were found to have been endured by her children while under her care, including the injury that resulted in the death of her oldest child, Jonathan. As the record establishes, the trial court ordered the children into State care after the following facts were learned:

1. On November 4, 2012, a referral came to the Department after the death of HJ's 3 year old son Jonathan and hospital staff noticed Jonathan had signs of external trauma with bruises on his face and neck area, abrasions on the bridge of his nose and right area of his forehead. RR-4 p. 23 and 90. A forensic nurse stated while the bruising on Jonathan's face could be consistent with the mother's explanation of a fall at the park that did not explain the bruises behind his ears, looped bruises on his legs and non-specific bruises on his back. RR-4 p. 24. A social worker at Texas Children's Hospital also advised that the youngest child, DJ, was developmentally delayed and a CT scan revealed he had abnormalities that could indicate previous abuse. RR-4 p. 26.

2. The Department worker did not initially see any observable injuries on HJ's younger children when she went for the family interview, but not long afterward she learned KJ had a broken ankle because she advised the Houston Police Department of that in preparation of the parent interview. RR-4 p. 26. HJ later claimed she did not tell the worker about that, because "she was nervous and forgot." RR-4 p. 26.

3. The assistant medical examiner ruled Jonathan's death a homicide by blunt force trauma to the abdomen. RR-4 p. 90. He told one of the officers he believed the cause of death was a perforated intestine which leaked bile into the child's body. RR-4 p. 90. He commented that injuries of that type typically take 48-72 hours before death results. RR-4 p. 90.

4. Jorge initially denied causing harm to Jonathan, but eventually admitted to "play boxing" with him on November 2, 2012. RR-4 p. 90. HJ claimed she was in another room at the time but admitted she "heard" Jonathan crying and Jorge told her he was "play boxing." RR-4 p. 90. Nonetheless, Dr. Phatak explained to perforate the child's intestines, "it would have been a 'substantial' strike in the torso" and not merely "play boxing." RR-4 p. 90. An indictment was issued against Jorge for felony murder in connection with Jonathan's death. RR-4 p. 90-93.

5. On November 7, 2012, a physician at Texas Children's Hospital prepared a statement regarding his conclusion that KJ had injury consistent with abuse or neglect. RR-4 p. 153. The aunt confirmed KJ's ankle injury occurred a month earlier and said HJ told her the injury resulted when KJ lost balance on a toilet seat. RR-4 p. 153. KJ's x-ray showed fracture of the distal right tibia and extensive callus formation indicating "repeated

28

trauma" as well as an unexplained healing abrasion of the nose. RR-4 p. 153. The child had unexplained injuries of different ages and swelling and symptoms of injury that apparently were not taken for medical attention. RR-4 p. 153.

6. Jorge admitted to "playfully hitting" Jonathan but claimed it was not hard enough to hurt him. RR-4 p. 26. HJ admitted "to seeing" Jorge hit Jonathan in the stomach but described it as in a "playful" manner. RR-4 p. 26. When asked about KJ's broken ankle, HJ claimed this happened when KJ stepped out of the tub and landed on her foot in a way that caused her to hurt her ankle. RR-4 p. 26. When asked about the possible head injuries seen on her youngest child's CT scan, HJ said neither she nor Jorge hit the child but claimed possibly her babysitter or one of the other children did. RR-4 p. 26. JJ claimed she did not have her babysitter's contact information. RR-4 p. 26.

These facts alone provided proof that HJ endangered her children. As indicated, contrary to the parents' story about play boxing, the assistant medical examiner concluded the force that perforated three year old Jonathan's intestines would have come from a "substantial strike in the torso." RR-4 p. 90-93 & 26. Also, a doctor who spoke with the child's aunt learned HJ told the aunt she was aware of DJ's broken ankle injury yet it remained untreated for about a month. RR-4 p. 153. That same doctor noted the child's x-ray revealed "repeated trauma," an unexplained healing abrasion of the nose, unexplained injuries of different ages and swelling and symptoms of injury that apparently were not taken for medical attention and which could have permanent consequences on the child's growth. RR-4 p. 153.

Considering HJ confirmed at trial that she was always with Jonathan and the other children in a one bedroom apartment or at the park, the trier of fact had more than sufficient basis to conclude the injuries observed on her children indicated she caused or allowed her children to be an abusive environment for a finding under Subsection E. RR-2 p. 14 & 20. *See Jordan v. Dossey,* 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child."). Moreover, because there was evidence of injuries that would have occurred on more than one occasion, described as "repeated trauma" and of different ages (RR-4 p. 153), this permitted an inference that she engaged in a pattern of behavior that would have likely continued to jeopardize her children. 325 S.W.3d at p. 724.

It is acknowledged that HJ denied she ever injured the children; however, a trier of fact was entitled to disbelieve that claim. *See In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005) (just because father claimed he did not know about child's injuries did not prevent trier of fact from concluding otherwise). It was within the province of the trier of fact to judge her demeanor and decide whether to believe her. *Id.* This is especially true considering the trier of fact heard her story change so much. For example, she first claimed she "heard" Jonathan crying during the time Jorge said he was play boxing with him; but she admitted to someone else "to seeing" Jorge hit Jonathan in the stomach in a "playful" manner. RR-4 p. 26 and 90. At

the time of trial, she initially denied she said she saw Jorge play boxing with Jonathan, but when asked again she admitted she did. RR-2 p. 16-17. Moreover, she changed her story again and claimed she never saw her boyfriend play boxing, and claimed she made that story up. RR-2 p. 17. The judge asked her to clarify if she was admitting she made that story up when she made that statement in court. RR-2 p. 28. She admitted she did. *Id.*. Consequently, the judge had more than sufficient basis to conclude HJ had a pattern of being untruthful, even while under oath in court. As such, there was little basis to conclude she was any more truthful by the time of trial. With such lack of truthfulness, the trier of fact had sufficient basis to conclude HJ was unwilling to admit or address her neglectful and dangerous conduct and that would, of course, make it impossible to ensure she could provide a safe environment for her children. On these facts, the court had overwhelming proof to support a finding of endangering conduct by HJ which was both legally and factually sufficient for a finding under Subsection E.

> **3. The evidence sufficiently supported the finding that termination was in the children's best interest considering the evidence in support of Subsection E, as well as the mother's failure to honestly address her inappropriate behaviors by the time of trial.**

The terms "best interest of the child" used in section 161.001(2) of the Family Code is not statutorily defined; however, the Supreme Court in *Holley v. Adams,* 544 S.W.2d 367, 371-72 (Tex. 1976), recognized a non-exhaustive list of factors that have been considered in determining a child's best interest. Those

31

factors include: (1) the child's desires; (2) the child's emotional and physical needs, now and in the future; (3) the emotional and physical danger to the child, now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist these individuals in promoting the child's best interests; (6) the plans for the child by the individual or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's act or omissions which may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *Id.*

Moreover, Section 263.307 of the Family Code provides factors that this court has found relevant to the best interest determination. *See In re J.D.,* 436 S.W.3d 105, 121 (Tex. App.—Houston [14th Dist.] June 10, 2014, no. pet.). In particular, that section provides "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest," and then goes on to list factors for a court to consider in determining a parent's willingness and ability to create a safe environment for the child. *Id.*; Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). In reviewing the evidence with respect to the applicable factors from *Holley* and Section 263.307 of the Family Code in this appeal, the best interest finding is firmly supported.

First, the same evidence already discussed above which indicated HJ engaged in conduct endangering to her children supported the court's conclusion

that termination was in the best interest of the children. *In re R.N.W.,* 01-13-00036-CV, 2013 WL 3467206 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("The same evidence of acts or omissions used to establish grounds for termination under subsection 161.001(1) may be probative in determining the best interests of the child."). A trier of fact could have also concluded that the risks from HJ's inappropriate behaviors prior to removal would likely reoccur and weighed in favor of a finding that parental termination was in the children's best interest. *See In re J.D.*, 436 S.W.3d at p. 118 (A fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent).

In addition, the evidence discussed above that indicated HJ was being deceitful about how she might have caused or allowed her children's injuries demonstrated that she was unwilling to address her unsafe behaviors through this process. As such, she did not show she had addressed her unsafe behaviors to allow a court to conclude she was willing to provide a safe, permanent place for her children without the risks previously present in her home. That would, therefore, mitigate in favor of a finding that termination is in the children's best interest. *See* Tex. Fam. Code Ann. § 263.307(a) (presuming the placement of the child in a safe and permanent placement to be in the child's best interest).

CJ's brief contends that, under *Holley*, the evidence was insufficient to support termination, because HJ had a loving relationship with her children and finished the basic tasks she was required to perform under the Department's service plan. As far as her completion of service plan tasks, there was no evidence that her completion of the basic tasks changed her positively or changed the risks that occurred in her home. Also, evidence that a child loves a parent is only marginally relevant under the *Holley* factors and cannot overrule a child's needs for safety and emotional health. *See In re L.D.A.,* No. 01-14-00782-CV, 2015 WL 293118 *6 (Tex. App. – Houston [1st Dist.] 2015, no pet.). While her children may reflect a loving response to her, that does not mean they felt safe with HJ and the evidence indicates they were not. *See In re T.L.R.*, No. 14-14-00812-CV, 2015 WL 1544796 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (while there was evidence the children missed their mother, that did not outweigh finding that termination was in children best interest, especially considering one of the children expressed she did not feel safe with her mother).

Moreover, no one testified that the children stated they wanted to go back to their mother, and the caseworker noted that youngest child (DJ) was too young to express his desires and KJ had not responded to that inquiry. RR-3 p. 25-26. Considering the situation these children must have endured under HJ's care and the fact KJ was now reporting she was hearing a baby cry constantly in her head, there

was more than sufficient basis for the trial judge to be concerned about continuing HJ's parent-child relationship with her children. RR-3 p. 14.

Also, these children were very young when they came into State care and were only 4 and 2 by the time of trial. RR-3 p. 13. The children's physical and emotional needs had been met in foster care and the home where they had been living for a long time while this case was pending expressed willingness to adopt. RR-3 p. 14-15 and 23. Solutions had been sought with family members, including a grandmother in California, but no family member had worked out. RR-3 p. 15. Because the need for permanence is a paramount consideration in evaluation of a child's present and future needs, a trier of fact likely would have considered the plan for adoption to be the best solution to ensure the children's present and future needs could be met. *See Dupree v. Texas Dep't of Protective & Regulatory Servs.,* 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ) ("The need for permanence is the paramount consideration for the child's present and future physical and emotional needs."); *see also* Tex. Fam. Code Ann. §263.307(a) (Vernon 2008). Consequently, considering the facts in this case, the court had more than sufficient evidence to find termination of HJ's parental rights was in the children's best interest. The trial court's finding should be affirmed.

WHEREFORE, PREMISES CONSIDERED, the Department requests that this court affirm the trial court's judgment and for such other and further relief to which it may be entitled in law or in equity.

Respectfully submitted,

VINCE RYAN
COUNTY ATTORNEY


By: */s/ Sandra Hachem*
**Sandra Hachem State Bar 08667060**
Sr. Assistant County Attorney
1019 Congress, 17th Floor
Houston, Texas 77002
Phone: 713/274-5293; Fax: 713/437-4700
Email: sandra.hachem@cao.hctx.net

Attorney for Appellee,
Department of Family & Protective Services


## CERTIFICATE OF SERVICE

I hereby certify that on this the 10th day of July 2015 a true and correct copy of this brief was sent to all parties to this appeal by sending a copy by electronic transmission to the Appellant care of her attorney of record William Thursland at his email address of wmthursland@hotmail.com. A copy on this same date was also sent to the attorney ad litem for the children, Michelle Bush, by electronic transmission to her fax number: 713/513-5451.

*/s/ Sandra D. Hachem*
Sandra D. Hachem

## CERTIFICATE OF WORD COUNT COMPLIANCE

This is to certify, pursuant to Tex. R. App. P. 9.4(i)(3), that the foregoing computer generated brief consists of no more than 15,000 words, excluding the

caption, identify of parties and counsel, table of contents, index of authorities, statement of the case, statement of issues presented, statement of procedural history, signature, proof of service, certification, certificate of compliance and appendix. Relying on the word count of the computer program used to prepare this document, the number of words, subject to count under the rules, is <u>9,061 words.</u>

<u>*/s/ Sandra Hachem*</u>
Sandra Hachem